2024 IL App (1st) 220229-U

No. 1-22-0229

Order filed May 31, 2024

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County. |
| v. | ) ) | No. 18 CR 10722 |
| CHRISTOPHER EMMONS, | ) ) | Honorable James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE ODEN JOHNSON delivered the judgment of the court.
Justices Hyman and C.A. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's conviction for second degree murder where the evidence was sufficient to establish that he had the requisite mental state for murder.

¶ 2    Following a bench trial, defendant Christopher Emmons was found guilty of second degree murder and sentenced to 16 years in prison. On appeal, defendant argues his second degree murder conviction should be reduced to involuntary manslaughter because the evidence failed to establish that he had the requisite mental state for the murder of Herbert Lemon. We affirm.

¶ 3 Defendant was charged by indictment with two counts of first degree murder and one count of unlawful restraint. The first count of first degree murder alleged that defendant intentionally or knowingly beat and killed Lemon (720 ILCS 5/9-1(a)(1) (West 2018)). The second count of first degree murder alleged that defendant beat and killed Lemon knowing that such act created a strong probability of death or great bodily harm (720 ILCS 5/9-1(a)(2) (West 2018)). The unlawful restraint count alleged that defendant knowingly without legal authority detained Lemon (720 ILCS 5/10-3(a) (West 2018)).

¶ 4 At trial, Peter Bowens testified to the following. Bowens and Lemon were cousins and on June 11, 2018, they went to the liquor store, A & S Beverages. Bowens attempted to purchase a single beer, but he did not have enough money. Lemon did not purchase anything.

¶ 5 The next afternoon, on June 12, 2018, Bowens and Lemon went to A & S Beverages again. Bowens did not know that Lemon had stolen a bottle of liquor from the store the day before and had he known, he would not have gone inside the store. Bowens put a beer on the counter and grabbed his wallet. The store security guard slammed a bottle on the counter and told Lemon, who was walking on the other side of the aisle, "[y]ou're going to pay for this." Bowens identified defendant in court as the security guard, describing him as tall, kind of heavyset, approximately 6'3", and "older looking." Bowens did not know defendant, nor had he seen him before. Bowens heard Lemon respond, "Pedro on that," which Bowens did not understand at the time and confused him.

¶ 6 Bowens then heard Lemon being beaten on the other side of the aisle and saw "maybe a punc.," Bowens also started getting punched and heard someone in front of him say, "[h]e's with him," but did not know who. Bowens could not recall how many times he was hit but thought three

people were attacking him. He tried to stop them and did not recall throwing any punches, but if he did, it was due to self-defense. Bowens could not see what was happening to Lemon at that point. He believed he and Lemon both ended up in the back of the store but could not really see because he was getting "jumped on."

¶ 7 Bowens was a FOID and concealed carry holder and acknowledged that he was armed with a .9 Beretta firearm while in the store that day. His firearm was on his hip in a holster. Bowens did not reach for, brandish, or threaten anyone with his firearm that day. He was not aware of who took his firearm and did not see it again until police officers returned it to him.

¶ 8 After the incident, Bowens and Lemon were able to get back up and on their feet. Everyone involved in the incident then gathered by the cashier area where the incident started and surrounded Bowens and Lemon. Defendant handcuffed Bowens and Lemon together. Police officers eventually arrived, and Bowens "pleaded" for them to watch the video as he did not steal. A sergeant arrived, viewed the video, and immediately removed the handcuffs. Bowens refused medical treatment at the scene. Bowens initially told police he wanted to press charges against everyone, but changed his mind when he was offered money by defendant and the store. They received a bottle of vodka, Bowens received $300, and Lemon received $50.

¶ 9 Bowens was "really bleeding bad," and Lemon looked "all right for a while," aside from a swollen face and a lump on his head. Lemon was able to talk. Bowens drove Lemon home. While they sat in the vehicle, they argued a little about the situation and drank some of the alcohol they had just received. Before Bowens left for the hospital where his son was having surgery, Lemon stated he had a "bad headache" and was going inside his home to lie down. Between the time

Bowens and Lemon left the liquor store and Lemon went inside his home, nothing else happened to Lemon and no one else hurt him in any way.

¶ 10    Bowens received medical treatment while at the hospital waiting for his son. Bowens was tested for stress and trauma to his neck and head, received an MRI, and received stiches over his eye. He had to undergo physical therapy for almost six months to treat his neck.

¶ 11    Later that day, Lemon's fiancée called Bowens and told him that Lemon was not waking up and coughing blood. Bowens told her to call an ambulance. When Bowens arrived at the hospital where Lemon was taken, he saw Lemon and thought he looked asleep. Bowens learned Lemon later passed away due to his injuries. To the best of his knowledge, Lemon had been in good health prior to that day.

¶ 12    The State introduced video footage from inside the store, which was admitted into evidence without objection. This court has viewed the video footage, which is included in the record on appeal. In one video depicting the scene before the altercation, Bowens, identified as wearing a black and blue jacket, and Lemon, identified as wearing a black jacket, walk into the store. Bowens retrieves a beer from a case, walks up to the register, and places the bottle on the counter. Lemon is behind him and has nothing in his hands.

¶ 13    In another video, defendant is seen repeatedly striking Lemon in his face, head, body, and throwing him to and dragging him across the floor. Two other employees are also seen striking and kicking Lemon all while he is crawling on the floor and attempting to escape. A blood smear is seen on the floor underneath Lemon when he is dragged by defendant and others. Lemon runs toward the front door while defendant and another employee follow after him. In another video,

Bowens is seen with blood on his face and Lemon is seen with two lumps near both of his eyes. Defendant handcuffs them together.

¶ 14    On cross-examination, Bowens clarified that he was not aware Lemon had stolen from the store the day before the incident, and if he had known, he would not have been happy to hear it. While Bowens was searching for the beer he wanted on the day of the incident, Lemon was looking around and did not pick up anything. Bowens did not see defendant strike Lemon the first time, but saw defendant strike him at some point. Bowens also heard someone say, "[h]e be with him," and then he started "getting attacked." Bowens did not hear Lemon shout, "Pedro get that gun;" rather, he heard "Pedro on that." Pedro was Lemon's nickname for him. Bowens denied that he told officers that he heard Lemon shout, "Pedro get that gun," explaining that he just repeated back what was said at the store.

¶ 15    Bowens assumed one of the employees took his firearm, but he could not recall when it was taken during the assault. Bowens did not hear Lemon say "shoot" or "shoot them." Bowens did not recall the length of the altercation, but it was longer than 10 seconds. Bowens and Lemon stayed in the store maybe 30 minutes after the altercation.

¶ 16    Bowens noticed Lemon had a bump over his right eye and some swelling on his face, but he did not see any lacerations on Lemon's head or blood coming from his nose. It was "kind of impossible" for Bowens to see anyone stomping or kicking Lemon, because Bowens was getting "jumped on." Bowens agreed that he only saw one punch thrown at Lemon.

¶ 17    Simone Christmon testified she was working at A & S Beverages as a cashier on the day of the incident. Her sister, Shadell White, came to visit her at the store that day. Also working at the store that day were "stock boy[s]" Thomas Wallace, Sammy Wallace, and Jamal Harris, and

their supervisor, Hanna Aboukier.[1] Christmon saw defendant, the store security guard, at the store almost every day.

¶ 18    On June 12, 2018, a little before 1 p.m., Christmon heard defendant tell Sammy that someone had stolen something the night before. She did not know what or who defendant was talking about. A little after 1 p.m., two individuals came into the store. One dressed in a black jacket was later identified as Lemon; the other dressed in jacket with blue tracking was later identified as Bowens. Christmon recognized Lemon as a regular customer, who came into the store almost every day.

¶ 19    Christmon was standing behind a cash register close to the main door talking to her sister when Lemon and Bowens came into the store. Bowens put a beer on the counter. Lemon was standing behind him. Defendant came up behind them, placed a bottle on the counter, and stated that they had to pay for the bottle that they stole the night before. Bowens asked, "what bottle?" She did not see weapons on either individual.

¶ 20    Defendant turned and punched Lemon in the face. Lemon began to flee toward the back of the store, and defendant struck him twice. Two more people, besides defendant and Lemon, were involved at that point. Thomas and Sammy began punching Bowens and everyone, including Christmon, began moving to the back of the store. There was a lot of commotion. Christmon saw someone on the ground with defendant, Harris, and Abdul Hamid El Khatib, another store employee, standing over the person, but she could not see who was on the ground. Defendant appeared to pick the individual up off the ground. The commotion stopped once Hanna came out

---

[1] We refer to Sammy and Thomas by their first names as they share the same last name. We refer to Hanna Aboukier by her first name as she shares the same last name as an individual named in a stipulation.

of her office and Lemon began to flee to the front door. Lemon was unable to exit the store as El Khatib was chasing him and trying to prevent him from leaving. Defendant handcuffed Bowens and Lemon prior to police arriving on scene.

¶ 21    On June 20, 2018, Christmon viewed the store's June 12, 2018, surveillance video footage and still photographs from the footage at the police department, where she identified the individuals present and involved. The State introduced the still photographs into evidence, which were entered into evidence without objection. This court has viewed the photographs, which were included in the record on appeal. The photographs show defendant striking Lemon in the face and standing over and holding him. They also show other employees, identified as Harris and El Khatib, striking and kicking Lemon.

¶ 22    On cross-examination, Christmon stated that defendant did not usually work in the afternoon around 1 p.m. He usually worked the evening shift, but it was a pay day, and he came in to get paid. She did not hear defendant say he was going to "kick anyone's ass." Defendant did not identify the person who had stolen the night before. Defendant and Sammy were outside when Bowens and Lemon went into the store.

¶ 23    Christmon testified that she heard defendant tell Lemon that he had to pay for the bottle he stole the previous night. Christmon saw Lemon mumble something to defendant but could not recall if he cursed at defendant. Defendant punched Lemon twice, and Lemon began running away and yelling to Bowens, "help, shoot, shoot." Christmon focused on both the altercation between Bowens, Thomas, and Sammy, and the altercation between Lemon and defendant. It was "all happening so fast" over approximately a minute.

¶ 24    Christmon saw Harris punch Lemon maybe twice on his body, and saw El Khatib, based on later viewing the video footage, kicking Lemon perhaps twice in the head. Christmon did not see any visible injuries on Lemon. She did not see Lemon strike defendant.

¶ 25    On redirect examination, Christmon stated her view of the altercation between defendant and Lemon became obstructed as they moved toward the back of the store, but she moved to get a better view. Defendant was the first person to throw a punch. When she heard Lemon shout, "help, shoot, shoot," defendant was running after him.

¶ 26    White testified that she visited her sister, Christmon, at A & S Beverages that day. Defendant was introduced to White as "Spaghetti." White heard defendant state that two "guys" who came in every day had stolen a bottle of tequila the night before. Defendant stated that when the men came in that day, he would put "the bottle" on the counter and tell "him" to pay for it and, if he did not pay for it, he was going to "beat his a**." Defendant said Christmon would know who it was because he would lock the door when the men came in and put the bottle on the counter.

¶ 27    White noticed two men walk into the store, later identified as Lemon and Bowens, and then defendant and another man, later identified as Sammy, came inside the store. Defendant locked the door. Bowens and Lemon went to the front of the store to "pay for the liquor." White was standing toward the back of the store and saw defendant put a bottle on the counter and then punch Lemon, the "dark-skinned man," as soon as he set the bottle on the counter. An older employee, later identified as Sammy, punched Bowens, the "lighter man," and people from the back of the store joined in and started fighting. White saw "bits and pieces" of the altercation. White did not see anyone holding a firearm and did not know how long the altercation lasted.

¶ 28    White viewed the store's surveillance video footage from that day and still photographs from the footage at the police department on June 19, 2018, wherein she identified the individuals present and involved.

¶ 29    The State introduced additional video footage from within the store, which was admitted into evidence without objection. This court has viewed the footage, which was included in the record on appeal. In one video, a closer view of the scene depicts defendant hitting Lemon multiple times in his face, head, body, and throwing him to and dragging him across the floor. Other individuals are also seen hitting and kicking Lemon, all while Lemon clutches his head and face and attempts to get up.

¶ 30    On cross-examination, White stated that she witnessed a majority of the altercation, but she did not see a man on the ground get kicked. She did not hear anyone yell "shoot" while she was in the store. White heard defendant say, "you gonna pay for that" before he punched Lemon. White did not remember seeing a firearm and was told after the altercation that a firearm was present.

¶ 31    The parties stipulated to the testimony of Hanya Aboukier, wife of the owner of A & S Beverages, and Hanna, day manager at A & S Beverages, the admission of multiple exhibits, and the publication of numerous portions of surveillance footage from the store on June 11, 2018, and June 12, 2018. If called to testify, Hanya and Hanna would testify that the surveillance system at A & S Beverages included multiple cameras capturing video both inside and outside of the store, with some, not all, having accompanying audio.

¶ 32    The State introduced additional video footage, which was admitted into evidence without objection. This court has viewed the footage, which was included in the record on appeal. In one

video, Bowens and Lemon enter the store, defendant enters the store after them, locks the door, and puts a black glove on one of his hands. Another individual, later identified as Sammy, is seen removing his glasses and hat. In another video, Bowens is seen at the counter attempting to purchase a beer and defendant places a bottle down on the counter and a second later begins to hit Lemon multiple times in the face, head, and body as Lemon attempts to flee the attack. Lemon also runs toward the front door but is grabbed by defendant and other employees. In another video, Lemon is seen attempting to get up and flee toward the back of the store and defendant picks him up by the back of his jacket and flings him backward. Lemon is seen clutching his face and head during the attack.

¶ 33     Jennifer Calhoun testified that she was Lemon's girlfriend in 2018, and they lived together. On June 12, 2018, between 2:30 p.m. and 3 p.m., Lemon came home "beat up." He had knots on his face and a "busted" lip. Lemon told her that his cousin, Pedro, had elbowed him in the face, but she did not believe him. Calhoun left to attend her daughter's graduation, and upon returning home at around 8:30 p.m., she found Lemon laying on the couch not breathing and bleeding from his mouth. He was wearing the same clothes as earlier. Calhoun called the paramedics. On cross-examination, Calhoun stated she had been gone for about five hours and did not know where Lemon was during that time.

¶ 34     Dr. Kirstin Howell, assistant medical examiner at the Cook County Medical Examiner's Office and an expert in forensic pathology, testified that she performed an autopsy on Lemon. The State introduced a copy of Howell's notes from the autopsy examination, which was entered into evidence without objection. This court has reviewed the notes, which were provided in the record on appeal. The notes indicate Lemon was 69 inches tall and 141 pounds.

¶ 35    Howell reviewed the hospital medical records and video from the incident as part of the autopsy. She noted Lemon had undergone significant medical treatment, which included a C-shaped staple incision on the left side of his head, indicating brain surgery, and a drain exiting the top of his head, indicating brain intervention.

¶ 36    The external examination of Lemon's body revealed he had a contusion or bruise on the left side of his chest and broken and missing teeth. The internal examination of Lemon's body revealed a hemorrhage on the left side underneath his scalp, a subdural hematoma, or blood clot, around the brain, and a subarachnoid hemorrhage, also over the brain. Lemon's brain was "very" soft, which happens when the brain begins to die. There was blood between his scalp and skull, between the dura and brain, and his brain was swollen.

¶ 37    Howell concluded the cause of death was a closed-head injury as a result of an assault and the manner of death was homicide. The cause and manner of death were consistent with Lemon receiving blows to the head and remaining conscious for several hours afterward. Lemon had a lucid interval period, lost consciousness, and then suffered a brain death.

¶ 38    On cross-examination, Howell stated that she recalled witnessing someone stomping on Lemon's head from her review of the video footage, which could produce the type of blunt head trauma and injuries Lemon suffered. On redirect examination, Howell stated that a blow or blows to the head could also result in the blunt head trauma that Lemon suffered.

¶ 39    Chicago Police Officer Alexander Gomez testified he and his partners, Officer Ebony Curl and Officer Trvon Tines, responded to a call at A & S Beverages around 1:15 p.m. on June 12, 2018, for a theft and possible person with a firearm. When he approached the store's door, it was locked and the security guard, whom he identified in court as defendant, unlocked it. Once inside

the store, Gomez saw two individuals, one beaten and bloody and another with minor bruises on his face. Defendant told Gomez that the store had been losing inventory for the last couple of days, and Bowens and Lemon had stolen items before and were planning on doing the same that day. Defendant said that they "were ready for them."

¶ 40    Gomez and his partners placed Bowens and Lemon in custody. Gomez was handed a firearm from defendant and some ammunition taken from the firearm from another employee. The officers retrieved identification, a concealed carry card, and a FOID card from Bowens, which were all valid.

¶ 41    Chicago Police Sergeant Markham Mendoza eventually arrived and viewed the video footage. Mendoza returned to the front of the store, and Bowens and Lemon were uncuffed after the realization that they were the "victims" that day. Gomez saw defendant pull Lemon to the side and heard small whispers, but Gomez did not know what was said. Gomez subsequently asked Lemon if he wanted to press charges, but he declined.

¶ 42    On cross-examination, Gomez stated he did not notice other physical injuries besides bruising on Lemon's face.

¶ 43    Mendoza testified that he responded to a dispatch of a person with a firearm at A & S Beverages around 1:15 p.m. on June 12, 2018. The store's front door was locked and defendant, whom he identified in court, unlocked it. Inside the store, Mendoza saw two individuals at the front of the store in handcuffs and they appeared to be beaten and bloody. Mendoza went into a back room and viewed the surveillance video footage from that day several times. Mendoza determined that Lemon and Bowens were the victims of a battery, and they did not appear to be committing any crime. Defendant initiated the attack against Lemon.

¶ 44    Mendoza saw, on the surveillance footage, defendant enter the store, follow both individuals, and put on at least one glove prior to the attack which, in his experience, appeared to be "reinforced along the knuckle part." After he viewed the footage, he returned to the front of the store and asked the officers to remove the handcuffs from Lemon and Bowens. Defendant approached Mendoza, and he believed he told defendant that he needed to call the police the next time a similar incident occurred, and he could not just hit people. The State introduced and published Mendoza's body-worn camera (BWC) video. Mendoza, after viewing the BWC, clarified no one was placed into custody when he and his officers left the store that day.

¶ 45    On cross-examination, Mendoza stated that he did not recall seeing anyone stomping on Lemon's head in the video footage. He did not know if defendant put on one or two gloves. Mendoza did not physically look at the gloves. Bowens looked in far worse shape than Lemon. Mendoza requested emergency medical services for Bowens and Lemons, but they refused treatment. He did not hear any witness tell him that someone shouted, "get the gun" or "shoot." Defendant apologized to both men, and then had a conversation with them that Mendoza did not hear.

¶ 46    The parties stipulated that on July 2, 2018, defendant was 6'3" tall and 300 pounds.

¶ 47    Joseph Summers, ambulance commander with the City of Chicago Fire Department, testified on behalf of defendant. On June 12, 2018, at 8:35 p.m., Summers responded to a call at a residence of someone having difficulty breathing. Inside the residence, Summers observed Lemon lying on the couch bleeding from his nose and mouth; he was having abnormal, gasping respirations. Lemon was unconscious and had broken teeth that were bleeding. Besides Lemon's bloody nose and mouth, Summers did not notice any other injuries to Lemon's head or face.

¶ 48    On cross-examination, Summers stated that he noticed "coffee-ground emesis" in Lemon's mouth, explaining this was vomit resulting from a gastrointestinal bleed in the stomach where the blood coagulates to resemble coffee grounds. Lemon was in "severe distress," which required advanced life support, and he did not regain consciousness. On redirect examination, Summers noted his report stated that there were no obvious signs of trauma to Lemon.

¶ 49    Sammy testified that he was employed at A & S Beverages as security and was working on June 12, 2018. Hanna showed him camera footage from a day or two earlier of a man getting bottles off the self and putting them in his pocket. He recognized the man, later identified as Lemon, as a regular customer.

¶ 50    On June 12, Sammy was outside the store with defendant and learned that Lemon was back in the store. Sammy ran inside and watched the video monitors. Defendant also returned inside. Sammy saw a man, later identified as Bowens, bend down at the beer cooler to get a beer. As Bowens did so, his shirt raised up in the back and Sammy saw the handle of a firearm protruding from his pants. He saw defendant grab a bottle off a shelf, place it on the counter where Bowens and Lemon were, and demand payment. Lemon told defendant, "f*** you, I ain't paying for s***." Defendant then punched Lemon with his fist twice in the chest. Lemon then said, "f*** you, shoot the gun, shoot the gun," which he directed at Bowens.

¶ 51    Sammy saw Bowens reach for the firearm, and he was afraid for everyone in the store. Sammy "reacted" by grabbing and hitting Bowens to try to get the firearm from him. He hit Bowens four times with his fist on his chest and face, Thomas hit him once, they fell, and Thomas retrieved the firearm from Bowen's pants. Thomas unloaded the firearm and put it on a shelf. Sammy did not see Harris or El Khatib strike anyone. After defendant hit Lemon twice, Lemon

ran to the back of the store and was "hollering shoot the gun." Sammy forgot about everything else while he was trying to get the firearm. Eventually, defendant and "the one that had gotten whooped" came back to the front and everyone was standing by the front door. Sammy noticed minor to no physical injuries on the two men and Bowens looked the worse of the two.

¶ 52 On cross-examination, Sammy stated that he took off his hat and glasses because he knew there might be a fight and was getting ready to watch. He stated that if Bowens had not reached for the firearm, he would have never "bothered." Lemon was already getting beat up by defendant when Lemon said something about a firearm. Sammy only saw defendant strike Lemon. He was not sure whether defendant first hit Lemon in the chest or the face.

¶ 53 Thomas testified he was working at A & S Beverages on June 12, 2018. He heard "rumbling," which sounded like bottles shaking and dropping on the floor, and someone say "shoot, shoot, shoot." Thomas saw his uncle, Sammy, in an altercation with Bowens. Thomas hit Bowens twice and eventually removed a firearm from him. Thomas took out the clip and bullets, wiped his fingerprints off of it, wrapped it in a towel, and gave it to defendant. The commotion at the front of the store had ended, and he did not see anyone strike anyone. He saw Lemon leave the store, and he did not appear to have any injuries.

¶ 54 On cross-examination, Thomas stated that defendant came into the store dressed in his security uniform even though he did not usually start work until later.

¶ 55 The trial court found defendant guilty of the lesser included offense of second degree murder on both counts I and II and of unlawful restrain. It merged the counts into second degree murder count I, premised on knowing/intentional murder. In its ruling, the court noted that given the store's "very serious" security system that it invested in and the private security, the store was

not going to rely on law enforcement for minor shoplifting incidents. The court noted that defendant locked the door because "he wanted to deal with the shoplifter." It also noted that other store employees were involved in the attack on Lemon. Defendant confronted Lemon and then immediately started beating him.

¶ 56    The court described the beating as "excessive and savage" and there was no question that it was "criminal in nature." The question was "[w]hat was [defendant's] mental state" at the time. The court stated that defendant was acting in his capacity as a security guard and he thought it "was his role to protect property and other people," and he was justified in doing it excessively. Defendant was trying to send a message, that "this is what happens to shoplifters," and he had the right to teach them a lesson. The court found defendant was not trying to kill Lemon, but defendant was "obviously wrong and mistaken about whether he had a justifiable reason to beat [Lemon] as he did. He knew. He had to know." The court watched the video of "the beating" several times. It stated defendant "sucker punched [Lemon] and he threw him to the ground hitting him and hitting him" but not "getting hit back." The court described it as a "one-sided show and it was excessive," and criminal.

¶ 57    Defendant filed a motion for a new trial, arguing the court erred in finding him guilty of second degree murder rather than involuntary manslaughter. The court denied the motion, stating:

> "It occurred to [the court], and [it] did consider involuntary manslaughter as a possibility here. But that's for reckless conduct. The conduct that was shown at this trial was intentional conduct by [defendant]. He had to know that the beating that he was administering, a lengthy beating which involved many, many blows, at least created a

strong probabil[i]ty of death or great bodily harm, particularly, should have known that it could cause great bodily harm, and it did ultimately cause death.

\*\*\*

So [the court] looked at it carefully. [It] rejected the government's application to find him guilty of first degree murder. [The court] tried to look carefully and \*\*\* did find some mitigating factors that [it] believe[d] made this finding more appropriate for second degree murder because [it] thought that [defendant] believed that he had some justification for the beating he administered. But he was mistaken about the severity of it. And [the court did not] find it was reckless because the beating and the punches were so intentional and \*\*\* it was all followed by his locking the door and keeping the person inside before the confrontation took place."

¶ 58    The court sentenced defendant to 16 years in prison on count I for second degree murder (720 ILCS 5/9-2(a)(2) (West 2018)). Defendant filed a motion to reconsider sentence, which the court denied.

¶ 59    On appeal, defendant argues his second degree murder conviction should be reduced to involuntary manslaughter because the evidence failed to establish that he acted with the requisite mental state where he did not intend to kill Lemon and had no way of knowing that his actions were practically certain to cause death or great bodily harm. Rather, defendant contends the evidence showed that he acted recklessly.

¶ 60    In considering a challenge to the sufficiency of the evidence, the relevant inquiry is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' "

(Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This court will not retry the defendant when reviewing a challenge to the sufficiency of the evidence. *People v. Nere*, 2018 IL 122566, ¶ 69. The trier of fact's role is to "assess the credibility of the witnesses, weigh the evidence presented, resolve conflicts in the evidence, and draw reasonable inferences from the evidence." *People v. Daniel*, 2022 IL App (1st) 182604, ¶ 102. A reviewing court will not substitute its judgment for that of the trier of fact with respect to those issues. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009).

¶ 61    The trier of fact need not "disregard inferences that flow normally from the evidence before it" or "search out all possible explanations consistent with innocence and raise them to a level of reasonable doubt." *People v. Jackson*, 2020 IL 124112, ¶ 70. Therefore, we "must allow all reasonable inferences from the record in favor of the prosecution." *People v. Givens*, 237 Ill. 2d 311, 334 (2010). A conviction will not be set aside unless "the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of the defendant's guilt." *People v. Bradford*, 2016 IL 118674, ¶ 12.

¶ 62    Defendant was charged with first degree murder but found guilty of second degree murder. Defendant was sentenced on count I. Thus, as charged, a defendant commits first degree murder when that defendant:

(a) *** kills an individual without lawful justification *** [and] in performing the acts which cause the death:

(1) he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another." 720 ILCS 5/9-1(a)(1) (West 2018).

¶ 63     The elements of first and second degree murder are identical, but second degree murder involves the presence of a mitigating factor, such as provocation or unreasonable belief in justification. *People v. Flemming*, 2015 IL App (1st) 111925-B, ¶ 53; see also 720 ILCS 5/9-2(a)(1), (a)(2) (West 2018). As such, a charge may be mitigated to second degree murder only after the elements of first degree murder are proven. *People v. Parker*, 223 Ill. 2d 494, 505 (2006). Here, the trial court found defendant's first degree murder offenses were mitigated to second degree murder as defendant had an unreasonable belief in justification for his conduct.

¶ 64     In contrast, a defendant commits involuntary manslaughter when he unintentionally kills another individual without lawful justification and his acts which cause the death are likely to cause death or great bodily harm and are performed recklessly. See 720 ILCS 5/9-3 (West 2018). The difference between first degree murder and involuntary manslaughter is the mental state that accompanies the conduct resulting in the victim's death. *People v. Jones*, 404 Ill. App. 3d 734, 742 (2010). Murder requires knowledge or intent (720 ILCS 5/9-1(a) (West 2018)), whereas manslaughter requires recklessness (720 ILCS 5/9-3 (West 2018)), a less culpable mental state. *Id*. Involuntary manslaughter therefore is a lesser-included offense of first degree murder. *People v. Eubanks*, 2019 IL 123525, ¶ 73.

¶ 65     A defendant acts intentionally when he possesses the "conscious objective or purpose *** to accomplish that result or engage in that conduct." 720 ILCS 5/4-4 (West 2018). A defendant acts knowingly when he is "consciously aware that his conduct is practically certain to cause a particular result." 720 ILCS 5/4-5(b) (West 2018). A defendant acts recklessly when he "consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result

will follow * * * and that disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." 720 ILCS 5/4-6 (West 2018).

¶ 66    A defendant's mental state is not commonly proven through direct evidence, but rather can be inferred from the "surrounding circumstances, including the character of the defendant's acts and the nature of the victim's injuries." *Jones*, 404 Ill. App. 3d at 744. We will reduce a murder conviction to involuntary manslaughter if the evidence is so improbable or unsatisfactory that it creates a reasonable doubt that defendant possessed the requisite mental state for first degree murder. *People v. Castillo*, 2018 IL App (1st) 153147, ¶¶ 25, 38.

¶ 67    In assessing whether a defendant acted recklessly, a court generally looks at the following factors: (1) the disparity in size and strength between the victim and the defendant; (2) the duration of the altercation and the severity of the victim's injuries; (3) whether a defendant used a weapon; (4) whether the victim incurred multiple wounds or injuries; and (5) whether the victim was defenseless. *People v. Himber*, 2020 IL App (1st) 162182, ¶ 31.

¶ 68    Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found defendant guilty of second degree murder. Multiple witnesses observed defendant initiate the attack by striking Lemon in the face immediately after placing a bottle on the counter and demanding payment from Lemon for the stolen liquor. Defendant had discussed the stolen liquor with multiple employees and stated that he would "beat [the thief's] ass" when the thief returned to the store, and he was "ready for them." Defendant stated his plan was to lock the door when the thief came back into the store, and he followed through when Lemon and Bowens returned to the store that day. An officer believed defendant put on a glove with reinforced knuckles prior to the attack. Defendant's autopsy showed Lemon suffered a brain death, and his

cause of death was a closed head injury due to assault and manner of death was homicide, which were consistent with someone who suffered multiple blows to the head.

¶ 69    The witnesses' testimony was corroborated by the store's surveillance footage. The various videos show multiple views both before and during the beating of Lemon. Defendant locks the door after Lemon and Bowens enter the store and puts a glove on one of his hands. Defendant immediately hits Lemon in the face after placing a bottle on the counter. He then strikes Lemon multiple times, too many to count, on his face, head, and body with both hands, including the one with the glove, and throws him on the ground more than once, all while Lemon attempts to escape the attack and protect his face and head. Nothing in the record shows Lemon was armed or that he was able to fight back against defendant. Other employees in the store also beat and kicked Lemon. A smear of blood is seen on the floor underneath Lemon while he is being beaten by defendant. Lemon attempts to flee the store, but defendant and another employee stop him. Lemon's face is swollen and there are visible lumps near both of his eyes after the incident.

¶ 70    Construing the evidence in the light most favorable to the State, we find that a rational trier of fact could find that defendant acted knowingly and intentionally when he beat Lemon, which ultimately resulted in his death. Defendant's words and actions prior to the attack, *i.e.*, his speaking to multiple employees about the alleged theft, stating he wanted to "beat [the thief's] ass" and was "ready for them," locking the doors to the store after Lemon arrived as he had planned, and putting a black glove on his hand that was possibly reinforced, indicate an intentional attack. It is a reasonable inference that, as the trial court found, defendant intended to teach the shoplifter Lemon a lesson by administering a beating, and he could not but be consciously aware that his conduct was practically certain to cause, at a minimum, great bodily harm, if not death.

¶ 71    This was not a situation where defendant struck Lemon only once or even a few times. Defendant launched an intentional, brutal attack where he struck Lemon repeatedly on his body, including his head, which housed a vital organ—his brain—and did not relent even when Lemon was defenseless and unresisting on the ground and/or trying to escape. A trier of fact could reasonably infer the requisite mental state for murder from defendant's words and actions before and during his beating of Lemon, which demonstrate defendant's intent to do great bodily harm to Lemon and knowledge that great bodily harm would result from his actions. See *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004) (all reasonable inferences are viewed in the light most favorable to the prosecution).

¶ 72    Our function is not to retry defendant, nor will we substitute our judgment for that of the trial court. *McLaurin*, 2020 IL 124563, ¶ 22. The trial court's finding of the requisite mental state for murder therefore was not inherently impossible or unreasonable. See *People v. Smith*, 149 Ill. 2d 558, 565 (1992) (we will not substitute our judgment for that of the trier of fact unless the inference of a mental state was inherently impossible or unreasonable). Defendant may have believed that his actions were justified in order to protect the store. But the evidence supports the trial court's finding that his belief was not justified. Accordingly, the evidence was sufficient to prove defendant guilty of second degree murder beyond a reasonable doubt. *Bradford*, 2016 IL 118674, ¶ 12.

¶ 73    Nevertheless, defendant contends that the evidence failed to establish he acted knowingly or intentionally, as he could not have known his actions would result in Lemon's death due to the brevity of the altercation, his use of fists rather than a weapon, and lack of visible injuries on Lemon. Defendant argues that, at most, he acted recklessly in his attack on Lemon.

¶ 74    Defendant's actions cannot be viewed as reckless where Defendant intended to "beat [the thief's] ass" and was "ready for them." While the attack may arguably have been relatively short in length and defendant only used his fists, the severity of Lemon's injuries suggests defendant did not simply consciously disregard a substantial and unjustifiable risk. Lemon's autopsy results showed brain swelling, brain bleeds, and brain death, all consistent with an individual receiving multiple and brutal blows to the head. The videos show defendant striking the unresisting Lemon uncountable times, pursuing him through the store as he tries to get away, throwing him to the ground, and pummeling him as he lay on the ground. Defendant had to have known that his numerous punches to Lemon's head and body and throwing him to the ground multiples times would cause death or great bodily harm to Lemon.

¶ 75    While it is a recognized principle that "death is not ordinarily contemplated as a natural consequence of blows from bare fists," it has also been recognized that "death may be the natural consequence of blows with bare fists where there is a great disparity in size and strength between the defendant and the victim." *Jones*, 404 Ill. App. 3d at 748. The evidence shows defendant was 6'3" tall and 300 pounds, whereas Lemon was only 69 inches (about 5'7") tall and 141 pounds, indicating a great disparity in size and strength between defendant and Lemon. It is not beyond belief that an attack involving repeated blows by a man of defendant's size against a man half his weight would result in death. And again, there was no evidence in the record establishing that Lemon defended himself by hitting defendant or any other store employee such that defendant's level of violence was justified.

¶ 76    The trier of fact is not required to "disregard inferences that flow normally from the evidence before it" or "search out all possible explanations consistent with innocence and raise

them to a level of reasonable doubt." *Jackson*, 2020 IL 124112, ¶ 70. In this case, the trial court explicitly explained in its denial of defendant's motion for a new trial that it considered and rejected involuntary manslaughter, finding defendant's actions were not reckless. Defendant is requesting that we reweigh the evidence and reach a different outcome, which we cannot do. *People v. Reynolds*, 2021 IL App (1st) 181227, ¶ 33. Construing all the evidence and reasonable inferences therefrom in the light most favorable to the State, we find the evidence was sufficient to prove defendant guilty of second degree murder beyond a reasonable doubt. *Cunningham*, 212 Ill. 2d at 280.

¶ 77    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 78    Affirmed.